**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| CHARLES A. BRAHOS, | ) | No. 16 B 2160 |
| | ) | |
| Debtor. | ) | |
| ———————————————— | ) | |
| | ) | |
| BMO HARRIS BANK N.A., f/k/a Harris N.A., | ) | |
| as assignee of the Federal Deposit Insurance | ) | |
| Corp. as receiver for Amcore Bank, N.A. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 A 358 |
| | ) | |
| CHARLES A. BRAHOS, | ) | |
| | ) | |
| Defendant. | ) | Judge Goldgar |

**AMENDED MEMORANDUM OPINION**[1/]

This matter is before the court for ruling after a trial on the adversary complaint of BMO

Harris Bank N.A. ("BMO") objecting to the discharge of chapter 7 debtor Charles A. Brahos.

BMO contends that within one year of his bankruptcy case, Brahos transferred to his wife his

interest in property the couple owned jointly in Skokie, Illinois, and that he did so intending to

hinder, delay, or defraud creditors.  BMO also contends that Brahos then made false oaths in the

schedules and statement of financial affairs he filed with his bankruptcy petition, false oaths

about (among other things) the assignment.  For these reasons, BMO says, Brahos should be

denied a discharge under sections 727(a)(2)(A) and (4)(A) of the Bankruptcy Code, 11 U.S.C. §§

---

[1/]     The amendments correct typographical errors and make stylistic changes.  There
are no changes to substance.

727(a)(2)(A), (4)(A).

What follows are the court's findings of fact and conclusions of law in accordance with

Rule 52(a)(1) of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 52(a)(1) (made applicable

by Fed. R. Bankr. P. 7052). For the reasons discussed below, judgment will be entered in favor

of BMO and against Brahos on both of the bank's claims. Brahos's discharge will be denied.

## 1. Jurisdiction

The court has subject matter jurisdiction under 28 U.S.C. § 1334(a) and the district

court's Internal Operating Procedure 15(a). This is a core proceeding. 28 U.S.C. § 157(b)(2)(J).

The court may therefore enter a final judgment. *In re Smith*, 848 F.2d 813, 816 (7th Cir. 1988);

*Monty Titling Trust I v. Granrath (In re Granrath)*, 560 B.R. 515, 518 (Bankr. N.D. Ill. 2016).

## 2. Findings of Fact

### a. The Brahoses and the Kirk Street Property

Charles Brahos ("Charles") is a businessman with a B.Ed. from the University of

Colorado. (Tr. 231-32).[2] He has been a licensed real estate broker in Illinois since 1979 and

operates his own real estate company, The Brahos Group, where he is engaged in real estate sales

and consulting. (*Id.* at 26). His wife Sharon Brahos ("Sharon") holds a B.B.A. from Western

Illinois University. (*Id.* at 178). For more than twenty years, she was the director of

administration at a small exterminating company where, among other things, she supervised the

company's accounting. (*Id.* at 177). For the past four years, she has worked in banking: at PNC

---

[2]      The trial transcript is cited as "Tr. at ___." The parties' joint list of stipulated
facts is cited as "Stip. ¶ ___." Because BMO alone introduced exhibits into evidence, the
exhibits are cited as "Ex. ___." The docket in the bankruptcy case is cited as "Dkt. No. ___."
The docket in the adversary proceeding is cited as "Adv. Dkt. No. ___."

Bank training tellers and at a Chase Bank automated bank center instructing customers about online banking, mobile banking, and the like. (*Id.* at 175-76).

Beginning in the 1950s, Charles's parents owned a residence at 4219 Kirk Street in Skokie, Illinois (the "Kirk Street property"). (Tr. at 27). In 1999, his mother sold the Kirk Street property to a Richard Jennings, transferring the property to a land trust with Chicago Title Land Trust Co. ("Chicago Title") as trustee and Jennings as the holder of the beneficial interest. (Tr. at 34-36, 154-55; Ex. 9). Later that year, Jennings sold the property to Charles and Sharon, assigning his beneficial interest to them as tenants by the entirety. (Tr. at 37-38; Ex. 12).

The Kirk Street property was encumbered with two mortgages, both in favor of Bank of America: a first mortgage securing a $300,000 loan, and a second mortgage securing a $294,000 home equity loan. (*Id.* at 59-60, 214-15).

The Brahoses lived at the Kirk Street property until 2005, when they moved to a new residence Charles had purchased in Highland Park, Illinois (the "Highland Park property"). (*Id.* at 209-10). But the Brahoses moved without selling the Kirk Street property. They had been trying to sell it since 2001 and had been unable to. (*Id.* at 210).

Adjacent to the Highland Park property were two vacant lots that Charles also owned, lots he hoped to develop and sell. (*Id.* at 233-34).

### b. The North Shore Auto Group Venture and the BMO Loans

Real estate development was not Charles's only venture. In 2006, he and some others invested in North Shore Auto Group, a car dealership. (*Id.* at 206-07). To make the investment,

Charles borrowed $750,000 from BMO.[3] The BMO loan was secured with a second mortgage

on the Highland Park property. (*Id.*). In 2007, Charles invested another $1 million in the

dealership. Again, he turned to BMO, obtaining a second loan, this one secured by a mortgage

on one of the two vacant lots. (Tr. at 207-08).[4]

The car dealership venture turned out to be a bust. Charles had a falling out of some kind

with his partners, and in September 2009 he brought an action against them in Illinois state court.

The action went to trial, and in March 2011 he obtained a favorable judgment and a damage

award of more than $2 million.[5] (Stip. ¶ 20; Tr. at 40). In November 2011, he received

$1,563,582.89 in partial satisfaction of the judgment. (Stip. ¶ 21).

### c. The Commonwealth Financial Network
### Accounts and the Promissory Note

On November 16, 2011, the payment on the judgment was wired to a joint account

Charles and Sharon had opened at Commonwealth Financial Network ("CFN") just twelve days

before. (Tr. at 49-53, 55, 239; Ex. 32 at CW1, CW9-10, CW40). The payment constituted the

only funds in the account. (Tr. at 53, 55-56, 163-64).

On January 11, 2012, Sharon opened an account in her own name at CFN. (Tr. at 158-59;

---

[3]     Technically, the money came from Amcore Bank, N.A. (*Id.* at 207). BMO is Amcore's successor as assignee of the F.D.I.C., receiver for Amcore. (Stip. ¶ 3).

[4]     According to Sharon, the loan resulting in the second mortgage on the Kirk Street property also concerned the car dealership. (Tr. at 181).

[5]     The action was styled *Brahos v. Chickerneo, et al.*, No. 09 L 556 (Cir. Ct. 19th Jud. Cir., Lake Cty., Ill.). The filing date is evident from the state court's docket, as is the date of the judgment. The docket is available at https://www.lakecountycircuitclerk.org, select "Public Access," search "Brahos." This court can take judicial notice of the records of other courts in related matters. *See Bank of Commerce & Trust Co. v. Strauss (In re Strauss)*, 523 B.R. 614, 623 n.7 (Bankr. N.D. Ill. 2014).

-4-

Ex. 32 at 462-63). Two days later, she and Charles transferred $500,000 from the joint CFN

account to Sharon's new account. (Tr. at 56, 159; Ex. 32 at CW2, CW23; Ex. 33 at CW641).

Twelve days after that, Sharon used $300,000 of the $500,000 to pay off the Bank of America

first mortgage on the Kirk Street property. (Tr. at 47-48, 60, 161, 168).

Although the $300,000 came from the damage award in the car dealership action and so

was originally Charles's money, Charles signed and gave Sharon a promissory note for $300,000.

(Tr. at 47; Ex. 29). When Charles gave her the note is unclear, but the note is dated January 12

(Ex. 29) – the day after Sharon opened her CFN account, the day before she and Charles

transferred the $500,000 to that account, and ten days before she paid off the mortgage.

The Brahoses were never able to offer a plausible reason for the note's execution.

Initially, they sought to link the note to the mortgage payoff. Charles at first testified that he did

not know where the money to pay the mortgage had come from, but he "assume[d]" it came from

Sharon. (Tr. at 48). Then he claimed she had paid off the Bank of America mortgage with

"separate funds" unrelated to the transfer from the CFN account. (*Id.* at 58-59). And then he

asserted she had "leveraged her stock portfolio" to pay off the mortgage – meaning she had taken

out a loan, borrowing against investments she owned in her own right. (*Id.* at 215).[6/] But Charles

could not identify the institution that made the alleged loan to Sharon (*id.* at 216-17), and no

documentation of such a loan was introduced.

Sharon likewise said at first that Charles gave her the note "[b]ecause he owed me

money," and he owed her money because she "was paying off a mortgage on the [Kirk Street]

house." (*Id.* at 155-56). Later, though, her testimony changed. She claimed she had demanded

---

[6/]      Charles made the same assertion in an affidavit filed earlier in the proceeding in
opposition to a BMO motion for summary judgment. (Tr. at 102-03; Ex. 7).

the note because of expenses for the Kirk Street property she had paid over the years. (*Id.* at 185-86, 188). But no evidence was introduced documenting the expenses Sharon said she paid, corroborating her payment of them, or connecting them with the $300,000 note (which did not mention them).

When pressed, both Brahoses admitted the money to pay off the mortgage had originated with Charles, not Sharon. (*See id.* at 159-61, 168, 236). The Brahoses' shifting and contradictory statements made their explanations of the note's origins incredible.[2]

The $300,000 transfer to Sharon was not the only transfer of funds from the judgment in the car dealership action. On December 5, 2011, the Brahoses transferred $135,000 to their joint account at Bank of America. (Tr. at 245-46; Ex. 32 at CW6). The next week, the Brahoses transferred another $150,000 to the same account. (Tr. at 245-46; Ex. 32 at CW3). All of the money was used to pay creditors. (Tr. at 245-46).

### d. The BMO Foreclosure Action

Meanwhile, Charles had long since defaulted on the second BMO loan, and in 2009 BMO's predecessor, Amcore Bank, brought an action against him in Illinois state court (the

---

[2]      According to Sharon, she took responsibility for the expenses on the Kirk Street property because she believed she was the sole owner of the property. (Tr. at 187). But this, too, was incredible. In September 2013, the Brahoses sent Chicago Title a letter of direction requesting "a copy of the beneficiary interest" in the land trust holding title to the Kirk Street property. (*Id.* at 168-69; Ex. 21). Chicago Title confirmed that the holders of the beneficial interest were "Chuck Brahos and Charon Brahos, as tenants by the entirety," and that the Brahoses held the power of direction. (Tr. at 168-69; Ex. 22). All this had been true since 1999 – for fourteen years, in other words. Charles admitted nothing had changed since 1999. (*See* Tr. at 65). Sharon had no reason to believe she alone owned the property.

"BMO action") to recover on the note and foreclose on the mortgage. (Stip. ¶ 4; Tr. at 43).[8/] Charles contested the action and also filed a counterclaim. (Tr. at 43).

From the start of the action through mid-2014, Charles was represented by counsel from the Miller Canfield firm. (*Id.* at 98, 221). In June or July 2014, his Miller Canfield counsel withdrew, and Charles retained Donald Morrison in their place. (*Id.* at 98-99, 221, 250).

Trial in the BMO action began in December 2014 and, the state court's docket shows, continued into March 2015, when the court heard closing arguments. (*Id.* at 43-44, 97). On July 1, 2015, the state court issued an opinion finding in favor of BMO and against Charles on both the complaint and the counterclaim. (*Id.* at 44-45, 67, 219).

After the state court issued its opinion, Charles began considering bankruptcy. He met with bankruptcy counsel in July to discuss the possibility of filing a bankruptcy case. (*Id.* at 68). Part of their discussion concerned the Kirk Street property. (*Id.*).

On December 10, 2015, the state court entered a judgment of foreclosure and sale in the BMO action that included an award of $1,753,055.89 in damages against Charles for breach of the note. (Stip. ¶¶ 5-6). His counterclaim was dismissed. (*Id.* ¶ 6).

In addition to the judgment owed BMO, Charles was left owing attorney's fees to Miller Canfield and to Morrison. Miller Canfield's fees alone totaled $480,000. (Tr. at 221). In January 2016, Morrison, apparently unpaid as well, withdrew as counsel. (Tr. 222).[9/] By then,

---

[8/]    The action was styled *Amcore Bank, N.A. v. Brahos*, No. 09 CH 2537 (Cir. Ct. for the 19th Jud. Cir. Lake Cty., Ill.). The caption is evident from the state court's docket, available at https://www.lakecountycircuitclerk.org, select "Public Access," search "Brahos." The court can take judicial notice of the docket. *See Strauss*, 523 B.R. at 623 n.7.

[9/]    The docket in the BMO action shows a "motion to withdraw as attorney" granted on January 7, 2016.

said Charles, "I was out of money." (*Id.*).

### e. The Assignment of Charles's Beneficial Interest and the Sale of the Kirk Street Property

In late August 2015, on the heels of the adverse ruling in the BMO action, the Brahoses entered into a contract to sell the Kirk Street property for $599,900. (Tr. at 66-67, 170; Ex. 40). The seller was Chicago Title as trustee; the buyers were Robert and Linda Silvers. (Ex. 40). The contract reflected The Brahos Group, Charles's company, as the broker for the seller. (*Id.*; Stip. ¶ 12)).

About two weeks after the contract was signed, Sharon again wrote Chicago Title "to confirm the beneficiary of the . . . land trust." (Ex. 23; Tr. at 70, 172). This was her first contact with Chicago Title on the subject since her September 2013 inquiry. At the time of this latest inquiry, the closing on the Kirk Street property was scheduled for October 1, 2015. (Tr. at 173). On September 28, just days before the closing, Chicago Title answered as it had before, identifying the beneficiaries as "Chuck Brahos and Sharon Brahos, his wife, not as joint tenants, or tenants in common but as tenants by the entirety." (Ex. 24; Tr. at 75, 173-74). Charles acknowledged that was his understanding as of September 28. (*See* Tr. at 74-75).

In August or September 2015, Sharon retained attorney Larry Berg to represent her in connection with the closing on the Kirk Street property. (Tr. at 77-78, 107).[10/]

On September 28 or 29, Berg prepared payoff letters, closing statements, and a "direction to convey." (Tr. at 112-13; *see* Ex. 25). The direction to convey was dated September 29 and was signed by Sharon but not Charles (Ex. 26; Tr. at 134-35), although as of September 29 they

---

[10/]      Why Charles did not retain Berg – it appears he had no attorney for purposes of the sale – was never explained.

jointly held the beneficial interest in the land trust.

That same day, Charles brought to Chicago Title a form "assignment of beneficial
interest" that he and Sharon had signed. (Tr. at 132-33; Ex. 27). The assignment stated that "for
value received," Charles assigned to Sharon 100% of his beneficial interest in the land trust, and
that the power of direction henceforth belonged to Sharon. (Ex. 27; *see also* Tr. at 79-80).
Joseph Sochacki, an assistant vice president and trust officer for Chicago Title, testified that
although the assignment was already signed, he prepared the rest of the form on September 28 or
29, filling in the rest of the information including the dates. (Tr. at 130-31). At Charles's
direction, Sochacki back-dated the assignment to "January 2, 2015," some nine months earlier.
(Tr. at 130-31; *see* Ex. 27).[11]

For their part, the Brahoses insisted the assignment of beneficial interest had not been
back-dated and really had been signed on January 2, 2015. But their varied explanations of how
and when the assignment came to be did not hold water.

• Charles denied preparing the assignment, said he was not present when it was prepared,
but maintained it had been prepared on or before January 2 and was signed on that date. (Tr. at
81, 100-01). At first, he claimed that one of the Miller Canfield attorneys prepared it. (*Id.* at 84,

---

[11]      The inference that Charles told Sochacki to back-date the assignment is the most
reasonable one. Sochacki testified credibly that he was "acting as typist for counsel and the
beneficiary." (Tr. at 131). Asked whether Berg had told him to date the assignment January 2,
Sochacki answered: "I don't recall who, but I was following instruction from Mr. Berg or Mr.
Brahos about dating that instrument." (*Id.* at 131-32). Berg, though, testified credibly – and
unequivocally – that he had not prepared the assignment, he had not directed anyone at his office
to prepare it, it was not the type of document he would normally prepare in connection with a
real estate transaction, and he had not seen this particular assignment until his deposition in 2017.
(Tr. at 109-10). Given Sochacki's credible testimony that either Charles or Berg instructed him
to back-date the assignment, and Berg's credible testimony that he did not, it is fair to infer that
Charles was the one who gave the instruction.

96-97). Questioned on the point, he then admitted that Miller Canfield had not represented him

since mid-2014 and so a Miller Canfield attorney could not have prepared it. (*Id.* at 98-99, 250).

He was also impeached with his deposition where he had said Berg prepared the assignment (*id.*

at 86, 247-49), and he later admitted Berg had not prepared it (*id.* at 218). Ultimately, Charles

conceded he did not know who prepared the assignment or where it had come from. (*Id.* at 219,

250 ("I can honestly say I'm not sure")).

· Like Charles, Sharon testified at first that the assignment had been signed in January

2015. (*Id.* at 191). She said she thought "one of the lawyers" had prepared it but was "not really

sure." (*Id.*). Once the assignment was executed, she said, she had set it aside and only located it

again in August or September 2015 when it was provided to Chicago Title. (*Id.* at 192). But she,

too, was impeached with her deposition where she had testified she did not know where the

assignment had come from or who had completed it. (*Id.* at 197). At her deposition, she had

also testified that once signed, the assignment must have been given to Chicago Title, and that

she "didn't do anything" with it herself. (*Id.* at 198-99).[12] She was no more credible than her

husband.

---

[12]    Sharon said she was sure the assignment had been signed in January because
Charles was about to have some form of "medical procedure that starts and stops your heart," so
"he was getting his paperwork together." (*Id.* at 191). Charles also tied the assignment to the
medical procedure, claiming he had told Sharon he had no life insurance and wanted to make
sure the property was hers "if I don't come out of it . . . ." (*Id.* at 218). None of this held water
either. The Brahoses owned the property jointly as tenants by the entirety (or more likely as joint
tenants, since their move to Highland Park had arguably severed the tenancy by the entirety, *see*
765 ILCS 1005/1c (2016) (stating that entireties property must be "maintained or intended to be
for maintenance as a homestead" and becomes a "joint tenancy" if the spouses maintain "other
property as a homestead")). Had Charles died, Sharon would have succeeded to the property by
operation of law. *Konfrst v. Stehlik*, 13 N.E.3d 278, 283 (Ill. App. Ct. 1st Dist. 2014). No
assignment would have been necessary. As sophisticated business people, one of them a real
estate broker for nearly four decades, the Brahoses must have understood this.

All told, in fact, the Brahoses came off as practiced liars. Not only was much of their testimony unbelievable on its face, but they repeatedly made statements and took positions from which they were later forced to retreat – for example, their insistence that Sharon had paid off the Kirk Street first mortgage with her own assets or money she had borrowed, their claim that the $300,000 promissory was connected in some way with a debt Charles owed her, and their claim that in December or January one of their lawyers had prepared the assignment of beneficial interest. On these subjects and others, the Brahoses were impeached with their depositions more than once. To stave off the conclusions that they were untruthful, the Brahoses went out of their way to appear fumbling, bumbling, and forgetful.[13] But their extensive business backgrounds and the studied way they went about their affairs belied any such appearance. As a general matter, their testimony at trial was simply unworthy of belief.

The sale of the Kirk Street property closed on October 1, 2015, as scheduled. (Tr. at 173; Stip. ¶ 13). Because Charles had assigned his beneficial interest to Sharon on September 29 (*see* Ex. 27), the direction to convey that Sharon alone had signed that same day (*see* Ex. 26) caused Chicago Title to issue a deed to the Silvers, the purchasers. (*See* Stip. ¶ 13; Ex. 41; Tr. at 135). Because the first mortgage on the Kirk Street property had already been paid off from the damage award in the car dealership action, only the second mortgage remained to be paid at closing. (Exs. 37, 41). After payment of the second mortgage and closing costs, then, the balance of the

---

[13]    Charles in particular tried to appear addled, muttering to himself on the witness stand, injecting extraneous comments at inappropriate points, and claiming he could not understand simple questions – until he was told to knock it off. (*See* Tr. at 91). He blamed the quality of his testimony on "cognitive difficulties" and "memory loss" resulting from various physical ailments and the medications he takes for them. (*Id.* at 201-05). But as BMO rightly observed (*see* Tr. at 261), his memory was excellent when he wanted it to be, and he offered no documentation of his claimed ailments and medications. On this point, as well, Charles's testimony was unconvincing.

proceeds – $275,504.43 – went to Sharon.  (Ex. 41; Tr. at 174-75).

As the selling broker, Charles received $14,702.50 as his commission on the sale.  But he received nothing at all for the assignment to Sharon of his beneficial interest in the land trust. (Tr. at 83-84).

### f.  The Bankruptcy Case

On January 25, 2016, four months after the Kirk Street closing and right before the scheduled foreclosure sale of the Highland Park lot, Charles filed a chapter 7 bankruptcy petition. (Stip. ¶ 7; Ex. 1).  Along with the petition, he filed the schedules and statement of financial affairs ("SOFA") that all debtors file.  (Ex. 1).  Accompanying the petition, schedules, and SOFA were declarations under penalty of perjury that Charles had read the schedules and SOFA and that the information in them was true and correct.  (*Id.*; Tr. at 19-20; 24-25).  Charles signed the declarations.  (Ex. 1; Tr. at 20, 25).

Question No. 8 of the SOFA asked: "Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?" (Ex. 1).  Question No. 13 of the SOFA asked: "Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?"  (*Id.*).  To both questions, Charles answered:  "No."  (*Id.*).  He failed to disclose the assignment to Sharon of his beneficial interest in the Kirk Street property.  (Stip. ¶ 16).  According to Charles, he had asked bankruptcy counsel whether the property "needed to be listed," and counsel had "said no."  (Tr. at 225).

Under Item No. 21 of his Schedule A/B, calling for "retirement or pension accounts," Charles listed two IRAs:  one with Equity Trust Company, another with LPL Financial.  (Ex. 1;

-12-

Stip. ¶ 17). He listed the value of each IRA as "$0.00." (Ex. 1; Stip. ¶ 17; Tr. at 227). That was

false. In fact, the Equity Trust IRA had a value of $320,000. (Exs. 43-44). According to

Charles, he gave the IRA a zero value because the account contained real estate, not cash. (Tr. at

225).

At his meeting of creditors the next month, Charles was told "to put 4219 Kirk Street on

[the] petition [*sic*]." (*Id.*). In March, he filed an amended SOFA that changed to "yes" his

answer to Question No. 8. (Dkt. No. 27).[14] Charles listed himself as the "insider," indicated the

amount of the payment as "$0," and gave this explanation:

> On 1-2-15 debtor executed Assignment of Beneficial Interest
> transferring his 50% interest in land trust holding title to 4219 Kirk
> St., Skokie, IL, in order to satisfy his obligation to her [*sic* –
> Sharon] arising out of a Promissory Note dated 1-12-12, in the
> amount of $300,000. The Note represents indebtedness to debtor's
> spouse for her 2012 payoff of a mortgage against said property;
> spouse used her separate funds to pay off said mortgage (loan).

(*Id.*). Charles signed the amended SOFA, declaring under penalty of perjury that his answers

were true and correct. (*Id.*).

All of his answer to Question No. 8 on the amended SOFA was false. The assignment

had not been executed in January 2015 but in September, right before the closing. The

assignment had nothing to do with the 2012 promissory note. The note, in turn, had nothing to

do with the payoff of the mortgage on the Kirk Street property. And the mortgage had not been

paid with Sharon's "separate funds" in any true sense but rather with funds she possessed only

---

[14]       Although the parties stipulated that Charles filed the amended SOFA in March
2016, for some reason the amended SOFA itself was neither marked as an exhibit nor introduced
into evidence. But just as the court can take judicial notice of the records of other courts in
related matters, it can take judicial notice of its own records. *See In re Allegretti*, 584 B.R. 287,
289 n.1 (Bankr. N.D. Ill. 2018).

because she and Charles had transferred to her CFN account $500,000 from his damage award in the car dealership action.

Along with the amended SOFA, Charles filed an amended Schedule A/B. (Dkt. No. 26). The amended Schedule A/B again listed the value of the two IRAs as "$0.00." (*Id.*).

In April, Charles filed an amended Schedule A/B that changed the value of the Equity Trust IRA from "$0.00" to $320,000." (Stip. ¶ 19; Ex. 3; Tr. at 22-23). He also filed an amended Schedule C claiming an exemption in the IRA. (Ex. 4; Tr. at 23-24). Along with the amended schedules, Charles filed another amended SOFA. (Ex. 5; Tr. at 24-25). His answer to Question No. 8 remained the same. (Ex. 5). He signed the new amended SOFA, declaring again under penalty of perjury that his answers were true and correct. (*Id.*).

In June, BMO filed an adversary complaint objecting to the dischargeability of Charles's debt to BMO as well as to his discharge. The adversary complaint contained two counts alleging four claims. Count I alleged a claim objecting to dischargeability under 11 U.S.C. § 523(a)(2). (Adv. Dkt. No. 1). Count II alleged claims objecting to discharge under 11 U.S.C. §§ 727(a)(2)(A), (4)(A), and (6)(A). (*Id.*).

At trial, BMO announced that it did not intend to proceed on the section 523(a)(2)(A) or section 727(a)(6)(A) claims. (*See* Tr. at 6).[15/] Therefore, only the section 727(a)(2)(A) and

---

[15/]     Shortly before trial, the parties had sought to dispose of the section 523(a)(2)(A) claim (but not the section 727(a)(6)(A) claim) through a stipulation to dismiss. (*See* Adv. Dkt. No. 80). Because Rule 41(a)(1)(A) permits a plaintiff only to dismiss "an action," not a claim in an action, *see* Fed. R. Civ. P. 41(a)(1)(A)(1) (made applicable by Fed. R. Bankr. P. 7041), the stipulation was ineffective, *see* 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2362 at 413 (3d ed. 2008).

(4)(A) claims were tried.[16]

### 3. Conclusions of Law

Judgment will be entered in BMO's favor on both claims. This matter presents a classic case of bankruptcy fraud. With his fortunes declining, Charles Brahos assigned to his wife, Sharon, his interest in a land trust holding property under contract for $600,000. The assignment, which Charles made right before the closing and for which he received nothing in return, allowed Sharon to collect all of the net proceeds from the sale – more than $275,000. Charles then sought to cover his tracks. Not only did he back-date the assignment itself, but when he filed his chapter 7 case he omitted any mention of it in his SOFA. Forced eventually to disclose the assignment, Charles filed an amended SOFA in which he fabricated an explanation for it that was patently false, making it seem legitimate when it was not. His discharge will be denied.

### a. Section 727(a) Generally

Section 727(a) of the Bankruptcy Code denies a discharge to a debtor "who has been unscrupulous in various ways." *Estate of Drabik v. Drabik (In re Drabik)*, 581 B.R. 554, 560 (Bankr. N.D. Ill. 2018); *Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 740 (Bankr. N.D. Ill. 2004). The bankruptcy laws are designed to aid the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991) (internal quotation omitted); *In re Kempff*, 847 F.3d 444, 447 (7th Cir. 2017). No discharge is available, consequently, to the debtor who has been "less than honest." *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002); *see also Kempff*, 847 F.3d at 447.

---

[16]      Because the other claims remained pending, and because BMO offered no evidence to support them, judgment will be entered in favor of Charles on those claims.

Though denial of a discharge is a "drastic" remedy, *Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002); *Jeffrey M. Goldberg & Assocs., Ltd. v. Holstein (In re Holstein)*, 299 B.R. 211, 233 (N.D. Ill. 2003) (calling it "an extreme step," "not to be taken lightly" (internal quotation omitted)), the discharge is a privilege, not a right, *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966 (7th Cir. 1999); *see also Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011). A debtor who has not been honest and forthcoming – particularly in connection with the bankruptcy case itself – does not deserve that privilege. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996); *see also Stamat*, 635 F.3d at 978; *Drabik*, 581 B.R. at 561.

Here, BMO proved both of its section 727(a) claims by a preponderance of the evidence. *See Kempff*, 847 F.3d at 447 (noting that the burden of proof on a section 727(a) claim is the preponderance of the evidence); *Stamat*, 635 F.3d at 978 (same).

### b. The Section 727(a)(2)(A) Claim

BMO easily demonstrated, first of all, that Charles should be denied a discharge under section 727(a)(2)(A).

Section 727(a)(2)(A) denies a discharge to a debtor who,

> with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition.

11 U.S.C. § 727(a)(2)(A). To succeed on its claim, BMO had to prove that (1) Charles transferred his property (2) within one year of the bankruptcy and (3) did so intending to hinder, delay, or defraud a creditor or the trustee. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd on other grounds sub nom. Kontrick v. Ryan*, 540 U.S. 443 (2004); *McWilliams*, 284 F.3d at

791. Reduced to its essence, the exception has two components: "an act (i.e., a transfer or concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay or defraud a creditor)." *Kontrick*, 295 F.3d at 736; *see also Olbur*, 314 B.R. at 742; *Holstein*, 299 B.R. at 226.

The evidence established the first component. Charles's beneficial interest in the land trust holding title to the Kirk Street property was "property" for purposes of section 727(a)(2)(A). *See Olbur*, 314 B.R. at 742-43. Charles transferred that property to Sharon. The assignment of a beneficial interest in an Illinois land trust is a "transfer" for purposes of section 727(a)(2)(A). *Id.* at 743. And the transfer took place within one year of the petition date. The assignment was executed on September 29, 2015. Charles filed his bankruptcy case on January 25, 2016, four months later.

At trial, Charles conceded all of this, maintaining only that he had no intent to hinder, delay, or defraud anyone. (*See* Tr. at 278-83).[17] But the evidence established his intent as well. To satisfy section 727(a)(2)(A), a debtor's intent to defraud must be actual, not constructive. *Kempff*, 847 F.3d at 448; *McWilliams*, 284 F.3d at 790. Because there is rarely direct evidence of it, though, intent can be inferred from circumstantial evidence. *McWilliams*, 284 F.3d at 791. Certain factors, or "badges," may warrant the inference and indicate fraud. These include "a lack

---

[17] Charles conceded the transfer occurred on September 29, 2015, rather than January 2, 2015, the date of the assignment – not because he admitted executing the assignment on September 29 (he did not) but because the assignment was not delivered to Chicago Title, the trustee, until then. (*See* Tr. at 279). Like most Illinois land trust agreements, the trust agreement here declared: "No assignment of any beneficial interest shall be binding on the trustee until the original or executed duplicate of the assignment is delivered to the trustee and accepted by it in writing." (*See* Ex. 9 at CTLTC26). Under this provision, the trustee's failure to accept the assignment made it ineffective to transfer ownership of the beneficial interest. *See United States v. Brown*, 820 F. Supp. 374, 383-84 (N.D. Ill. 1993); *In re Ainslie & Belle Plaine L.P.*, 145 B.R. 950, 955-56 (Bankr. N.D. Ill. 1992); *see also Olbur*, 314 B.R. at 743 & n.7 (dictum).

-17-

of consideration for the transfer; a familial or close relationship between the parties; the debtor's retention of possession, benefit or use of the property; the debtor's dire financial straits at the time; and the chronology of the events in question." *Olbur*, 314 B.R. at 744; *see also McWilliams*, 284 F.3d at 791. "[J]ust one" badge can be enough to show intent. *Holstein*, 299 B.R. at 230 (internal quotation omitted). "[T]he accumulation of several . . . indicates strongly" that the debtor's intent was fraudulent. *Id.*

Several were present here. Charles transferred his beneficial interest in the land trust to a family member, his wife Sharon. He received nothing in return. At the time of the transfer – September 29, 2015 – he had known for three months that he had lost BMO's action against him and was facing a judgment of more than $1.7 million. Between the state court's decision in July and the transfer in September, he had consulted bankruptcy counsel. Just four months after the transfer, he filed his chapter 7 case. "Transferring property to a relative for no consideration on the eve of bankruptcy is a textbook example of fraud." *Olbur*, 314 B.R. at 744 (citing *Rogers v. Boba (In re Boba)*, 280 B.R. 430, 435 (Bankr. N.D. Ill. 2002)).

But there is more. Mere days before the closing, Charles presented the assignment to Chicago Title and had the trust officer back-date it to January 2, 2015. Then, on filing bankruptcy, Charles failed to mention the transfer in his SOFA. Only when the transfer was revealed at the creditors' meeting did he amend the SOFA to disclose it. But in doing so he compounded the problem, concocting a story designed to distance the transfer from the bankruptcy and make it appear he had received some consideration for his interest. He said in his amended SOFA that the assignment had in fact been executed on January 2, 2015. He said the assignment was meant to satisfy his obligation to Sharon arising out of the January 12 promissory note. And he said the note represented his debt to Sharon because she had used her

own funds to pay off a mortgage on the Kirk Street property. None of this was true.

Charles's back-dating of the assignment, his initial concealment of the transfer, and his later attempt to explain the transfer away through falsehoods all underscore the transfer's fraudulent nature. *Smith v. Bowen (In re Bowen)*, 498 B.R. 584, 588 (Bankr. W.D. Va. 2013) (listing "[s]ecrecy or concealment of the transaction" as an additional badge of fraud); *Ng v. Adler (In re Adler)*, 494 B.R. 43, 66 (Bankr. E.D.N.Y. 2013) (same), *aff'd,* 518 B.R. 228 (E.D.N.Y. 2014). Taken as a whole, the evidence strongly suggests an intent on Charles's part to defraud creditors.

In his closing argument at trial, Charles pivoted once again. He argued that his intent was innocent because he and Sharon had always considered the Kirk Street property to be hers, and he assigned his beneficial interest to her as repayment for expenses she supposedly had borne over the years to maintain the Kirk Street property. (Tr. at 285-86, 294). The $300,000 transfer from the joint CFN account to Sharon's CFN account was characterized as compensation "for what she had done for the family for years . . . ." (*Id.* at 292). As for the execution of the assignment itself, he noted that both he and Sharon testified the document had been signed on January 2, not September 29 (*Id.* at 284), and the contrary testimony of Sochacki (the Chicago Title trust officer) was termed not just unbelievable but "shocking" (*id.* at 278).

This argument simply highlights the Brahoses' lack of credibility. At trial, the Brahoses offered many different explanations for the $300,000 payment and the promissory note. Only one was the "repayment for expenses" explanation. That explanation arrived about the time the "Sharon leveraged her stock portfolio to pay off the mortgage" explanation fell apart. Nor was the explanation believable: no documentation of any expenses was ever supplied. *Cf. Cogliano v. Hegarty (In re Hegarty)*, 208 B.R. 760, 763 (Bankr. D. Mass. 1997) (refusing in the absence of

-19-

documentation to credit a debtor's claim that he had paid rent on property he had transferred). And the underlying premise of the argument – that the Brahoses always thought the Kirk Street property belonged to Sharon – was utterly implausible, given their experience and sophistication in business and real estate matters.

Equally implausible was the Brahoses' assertion that the assignment was executed in January. Both Sharon and Charles claimed to remember signing the assignment in January because Charles was about to have a medical procedure. But given their joint ownership of the Kirk Street property, no assignment was necessary.[18] And that explanation, too, went uncorroborated: no documentation was ever provided showing he had such a procedure (or, for that matter, that he suffered from any of the other maladies he claimed). The Brahoses had no other explanation for the presence of the January 2 date on the assignment. Far from "shocking," Sochacki's testimony about how the assignment came to be back-dated was entirely credible. The Brahoses' testimony was not.

Although proof of harm to creditors is unnecessary for a debtor's discharge to be denied under section 727(a)(2)(A), *McWilliams*, 284 F.3d at 793; *In re Snyder*, 152 F.3d 596, 601 (7th Cir. 1998), it is worth noting, finally, that Charles's transfer did in fact harm his creditors. The whole point of the exercise was to hold on to the equity in the Kirk Street property, equity generated when the Brahoses used part of the car dealership judgment to pay off one of the mortgages. Had Charles not assigned his beneficial interest to Sharon right before the closing, half of the net proceeds from the sale would have gone to Charles. That money would then have

---

[18]       The alleged January execution of the assignment also contradicted the Brahoses' contention that they always believed the property belonged to Sharon. Had that been their belief, no assignment would have been necessary. Charles would have had no interest to assign.

been available to pay his creditors.  As it was, all the net proceeds from the sale went to Sharon.

Creditors got nothing.[19]

Because Charles transferred property within a year of his bankruptcy intending to hinder,

delay, or defraud creditors, judgment will be entered in favor of BMO and against Charles on the

section 727(a)(2)(A) claim.

### c.  The Section 727(a)(4)(A) Claim

BMO also demonstrated that Charles should be denied a discharge under section

727(a)(4)(A).

To receive a "fresh start" under the Code, a debtor must present full and accurate

information about himself and his affairs.  *Drabik*, 581 B.R. at 563.  All assets and ownership

interests must be disclosed, and all questions in the schedules and SOFA must be answered

completely and honestly.  *Id.*  Indeed, "'[t]he very integrity of the bankruptcy court and the

successful administration of the bankruptcy system rest upon compliance with the debtor's

obligation of disclosure.'"  *Id.* at 554 (quoting *Urological Group, Ltd. v. Petersen (In re*

*Petersen)*, 296 B.R. 766, 790 (Bankr. C.D. Ill. 2003)).  Complete and honest disclosure is

therefore "a condition precedent to the privilege of discharge."  *Glucona Am., Inc. v. Ardisson (In*

*re Ardisson)*, 272 B.R. 346, 359 (Bankr. N.D. Ill. 2001).

Section 727(a)(4)(A) enforces this "paramount and absolute" duty, *Petersen*, 296 B.R. at

790, by denying a discharge to a debtor who has "knowingly and fraudulently, in or in connection

with the case . . . made a false oath or account."  11 U.S.C. § 727(a)(4)(A).  To prevail under

---

[19]     Creditors will receive a distribution in the bankruptcy case, but it appears the
distribution will come from the balance of the car dealership judgment. (*See* Dkt. No. 62).

section 727(a)(4)(A), BMO had to prove that (1) Charles made a statement under oath; (2) the

statement was material to the bankruptcy case; (3) the statement was false; (4) Charles knew the

statement was false; and (5) he made the statement with an intent to deceive. *Lardas v. Grcic*,

847 F.3d 561, 569 (7th Cir. 2017); *Kempff*, 847 F.3d at 449; *Stamat*, 635 F.3d at 978; *Olbur*, 314

B.R. at 745. For purposes of the statute, a false statement includes an omission. *Layng v.*

*Urbonas (In re Urbonas)*, 539 B.R. 533, 547 (Bankr. N.D. Ill. 2015); *see, e.g., Skavysh v.*

*Katsman (In re Katsman)*, 771 F.3d 1048, 1049-50 (7th Cir. 2014).

The evidence established each element. First, Charles made statements under oath

"because all debtors swear to the accuracy of their petitions and schedules." *Olbur*, 314 B.R. at

745; *see also Drabik*, 581 B.R. at 563-64. Charles declared under penalty of perjury that the

information in the initial SOFA and the two amended SOFAs was true and correct. Second, his

answers to Question No. 8 on the SOFAs were material because they related to his business

transactions, his assets and their discovery, and the existence and disposition of his property.

*Lardas*, 847 F.3d at 570; *Stamat*, 635 F.3d at 982; *Olbur*, 314 B.R. at 745.

Third, his answers to Question No. 8 on each of the SOFAs were false.[20] On the initial

SOFA, he omitted any mention of the assignment to Sharon of his interest in the Kirk Street

property. On the first amended SOFA, he listed the assignment but only after the assignment was

---

[20]    The evidence also established another omission. On his initial Schedule A/B,
Charles said that one of his IRAs had no value when in fact it held real estate worth $320,000.
Unlike the omission on the SOFAs, however, this one was corrected with an amended Schedule
A/B that was accurate. The omission appeared to be an error and standing alone would not be
enough to deny Charles his discharge. *See Drabik*, 581 B.R. at 564-65 (noting that a single
innocent omission or error is usually insufficient to satisfy section 727(a)(2)(A)); *Olbur*, 314
B.R. at 745. The mistaken Schedule A/B coupled with the false SOFAs also do not form the
kind of pattern that suggests a general "reckless indifference to the truth." *Drabik*, 581 B.R. at
565. The SOFAs are the problem here, not the Schedule A/B.

disclosed at his creditors' meeting – and on the amended SOFA he gave as his reason for the

assignment an elaborate explanation that, as explained earlier, was a tissue of lies. His second

amended SOFA again listed the assignment and again repeated the same elaborate-but-false

explanation of how it came about.[21]

Fourth, Charles knew the statements were false and made them with a fraudulent intent.

For a debtor to have the intent that will bar his discharge, he must either have knowingly

intended to defraud, *Kempff*, 847 F.3d at 449, or he must have "engaged in such reckless

behavior as to justify the finding of fraud," *In re Yonikus*, 974 F.2d 901, 905 (7th Cir. 1992); *see

also Drabik*, 581 B.R. at 564. As with section 727(a)(2)(A), evidence of intent for purposes of

section 727(a)(4)(A) can either be direct or circumstantial. *Sullivan v. Ratz*, 551 B.R. 338, 351

(N.D. Ill. 2016); *Urbonas*, 539 B.R. at 547.

This is the rare case where circumstantial evidence showed the debtor acted, not merely

out of reckless disregard for the truth, but with a deliberate intent to defraud creditors. Charles

knew he had assigned his interest in the Kirk Street property to Sharon just four months pre-

petition, yet he failed to disclose the assignment on his SOFA. When he amended the SOFA to

disclose it, he tried to make the assignment appear legitimate by supplying an explanation that

was false – and that he knew to be false. In his amended SOFAs, he said the assignment was

meant to satisfy his obligation to Sharon under the promissory note when he knew it was not. He

---

[21]    It might be argued that Charles did not have to disclose the assignment in
response to Question No. 8 because the question asked about a transfer "on account of a debt,"
and there was no debt connected with the assignment to Sharon. But Question No. 13 of the
SOFA asked about "gifts with a total value of more than $600," and Charles did not disclose the
assignment in answer to that question, either. No matter what, in other words, the assignment
had to be disclosed, and it was not. Once disclosed in answer to Question No. 8, moreover,
Charles sought to explain it away with a series of falsehoods.

said the note represented a debt he owed to Sharon for her payment of the mortgage on the Kirk

Street property when he knew it was not. And he said Sharon had used her "separate funds" to

pay off the mortgage when he knew she had not.

The omission and false statements were not mere errors. Charles is a college graduate, a

businessman, and a licensed real estate broker and consultant with nearly forty years experience.

He had to have recognized both that he was swearing to the accuracy of the SOFA and that the

information he provided was inaccurate. *See Stamat*, 635 F.3d at 982 (noting the debtors' "level

of education and business experience"); *In re Chavin*, 150 F.3d 726, 729 (7th Cir. 1998)

(upholding denial of discharge where the debtor was "a mature and experienced businessman");

*Schechter v. Hansen (In re Hansen)*, 325 B.R. 746, 759 (Bankr. N.D. Ill. 2005) (finding intent

where the debtor was "an intelligent and educated businessman"); *Olbur*, 314 B.R. at 746

(inferring intent where the debtor was a "well-educated businessman . . . acquainted with

financial matters"). Although at trial Charles sought to appear bewildered and befuddled, his act

was unconvincing. He admitted both that he had assigned his interest in the property and that the

assignment had enabled Sharon to receive the net proceeds from the sale. His intent in the

SOFAs was to hide the assignment and then disguise it as a genuine transaction.

At trial, Charles offered two arguments in his defense, but neither was persuasive. First,

he stressed that he had amended his SOFA to disclose the assignment. (Tr. at 295-96). "Filing

schedules and then ultimately correcting them," he said in his closing, "does not . . . by itself

indicate an intent to deceive." But an amendment alone cannot cure a false oath. *Drabik*, 581

B.R. at 565. And although an amendment may indicate an innocent intent, *Bensenville Cmty.*

*Ctr. Union v. Bailey (In re Bailey)*, 147 B.R. 157, 165 (Bankr. N.D. Ill. 1992); *contra Stamat*,

635 F.3d at 982 (noting that the debtors' amendments did not "negate a finding of intent or cure

-24-

the initial failures"), Charles's amended SOFAs, filed only after the omission had been revealed

and replete with new falsehoods, hardly indicate innocence. *Cf. Urbonas*, 539 B.R. at 553-54

(discounting amendments that were not only misleading but made only after the U.S. Trustee and

panel trustee had begun an investigation).

Second, Charles laid the blame, at least for the initial omission, on his bankruptcy

counsel, testifying that he had asked counsel whether the property "needed to be listed" and had

been told "no." (Tr. at 225). Many courts reject either partly or completely an "advice of

counsel" defense to a section 727(a)(4)(A) claim. *See, e.g., In re Loganbill*, 554 B.R. 871, 878

(Bankr. W.D. Mo. 2016); *In re Gonzalez*, 553 B.R. 467, 474 (Bankr. E.D.N.Y. 2016); *In re Wen

Jing Huang*, 544 B.R. 256, 265 (Bankr. D. Mass. 2016); *Hansen*, 325 B.R. at 760 n.10; *Olbur*,

314 B.R. at 746-47. Last year in *Kempff*, though, the Seventh Circuit announced for the first

time that "[a] debtor's testimony about advice from her bankruptcy attorney . . . may tend to

negate fraudulent intent." *Kempff*, 847 F.3d at 451.

But the *Kempff* endorsement is lukewarm at best. The court said only that advice of

counsel "may tend to negate" an inference of intent, *id.*, not that it always will or that it is

sufficient in itself to do so. Here, Question No. 8 of the SOFA (or else Question No. 13) clearly

called for disclosure of the assignment, and the advice counsel gave Charles not to disclose it was

clearly wrong.[22/] If, that is, the advice was even given. Charles's assertion that it was, like so

---

[22/]    Courts of appeals that might otherwise accept advice of counsel as evidence
negating fraudulent intent refuse to do so when the advice was clearly wrong. *See, e.g., Zizza v.
Harrington (In re Zizza)*, 875 F.3d 728, 732 (1st Cir. 2017) (stating that advice of counsel is not a
defense "when it is transparently plain" that the information omitted from the schedules should
have been provided (internal quotation omitted)); *Robinson v. Worley*, 849 F.3d 577, 586 (4th
Cir. 2017) (stating that the debtor must have acted "in good faith," and even then advice of
counsel is not a defense "when it should have been obvious to the debtor that his attorney was
mistaken"); *In re Retz*, 606 F.3d 1189, 1199 (9th Cir. 2010) (adopting the First Circuit's "good

much of his testimony, was uncorroborated: his bankruptcy counsel was not called as a witness and so did not confirm Charles's version of events. In the face of that version, counsel's absence bolstered the inference of fraudulent intent that Charles's conduct as a whole so plainly warranted. *See Katsman*, 771 F.3d at 1050 (finding it "striking" that counsel was not called to testify in support of the debtor's advice of counsel argument and concluding that counsel's absence "reinforce[d]" the inference of intent).

Because Charles made a false oath in connection with the bankruptcy case, judgment will be entered in favor of BMO and against Charles on the section 727(a)(4)(A) claim.

### 4. Conclusion

For these reasons, plaintiff BMO Harris Bank N.A. is entitled to judgment against Charles A. Brahos on the section 727(a)(2)(A) and (4)(A) claims in Count II of the adversary complaint. Brahos will be denied a discharge. Brahos is entitled to judgment in his favor and against BMO on the section 523(a)(2)(A) claim in Count I and the section 727(a)(6)(A) claim in Count II. A separate Rule 7058 judgment will be entered consistent this opinion.

Dated: August 7, 2018

A. Benjamin Goldgar
United States Bankruptcy Judge

---

faith" limitation and stating that advice of counsel is no defense "when the erroneous information should have been evident to the debtor").

-26-